JODI LINKER
Federal Public Defender
Northern District of California
DAVID W. RIZK
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700
Facsimile: (415) 436-7706
Email: david_rizk@fd.org

Counsel for Defendant ESCOTO-ESCOTO

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MAINOR ESCOTO-ESCOTO,<br><br>Defendant. | **Case No.:** CR 22-00133 VC<br><br>**DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE**<br><br>**REDACTED** |

**I.     INTRODUCTION**

Mainor Escoto-Escoto will be before the Court for sentencing in this drug sales case from the Tenderloin. Like other defendants the Court has seen, Mr. Escoto immigrated to the United States to flee extreme poverty in rural Honduras. This case represents Mr. Escoto's first ever conviction and sentence. There is no doubt that Mr. Escoto has made some very poor decisions in the last two years since his first arrest in February 2021. However, Mr. Escoto is also just twenty years old. He has no family or support structure in the United States and with just a second-grade education (he cannot read or write), he was ill-equipped to take care of himself in the United

States alone. Young people with no family support or guidance who find themselves in dire straits are prone to making poor decisions without considering the consequences. For a variety of reasons, Mr. Escoto also was not afforded the opportunities that other defendants before the Court often receive: he could not obtain release on bail because he had nobody qualified to sign a bond for him here in the United States; the Court's Leading Emerging Adults to Develop Success (LEADS) program was unavailable because he does not speak English and thus could not engage in the programming; ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Mr. Escoto has already served approximately nine months in custody and any prison sentence will profoundly impact his life and almost certainly result in his removal to Honduras. Mr. Escoto appreciates that U.S. Probation recommends 36 months, a significant downward variance from the excessive 57-month Guideline sentence recommended by the government. Notably, 36 months is basically the average sentence that defendants under the same Guidelines as Mr. Escoto have received over the past five years nationally in cases involving the same amount of fentanyl. PSR ¶ 68. While this case concededly has aggravating factors—namely, the firearm and the repeated arrests—Mr. Escoto is surely more deserving of leniency than the "average" defendant nationally. He is extremely young, was raised in the most destitute circumstances, and remains in a very, very precarious and vulnerable position. He therefore respectfully asks for a sentence of 24 months. A year more in custody will not serve any useful purpose. The intervention will already be accomplished and he will be removed from this community. Two years is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

//
//
//

---

DEFENDANT'S SENTENCING MEMORANDUM
*ESCOTO-ESCOTO*, CR 22–00133 VC

2

## II.   FACTUAL BACKGROUND

Mr. Escoto was born in 2002 and raised by his mother Irma Asucena, age 49, and Cristo Arjelio, age 62, his stepfather.[2] Like other Honduran defendants recently before the Court, Mr. Escoto grew up in small rural town called St. Ignacio, in the state of Francisco Morazan, Honduras. It was approximately an hour walk on dirt roads to the nearest small city. Of course, his family did not have a car or a truck. On the weekends, Mr. Escoto would walk to the city with his parents to buy food supplies and then carry it back to their house in the country. Mr. Escoto describes the surround area as agricultural flatlands. There were only three other residences in the immediate area around his family's house. The family house is itself extremely modest: a two-room adobe structure without electricity or running water. As the PSR notes, they fetch water from a nearby stream and carry it to the house for cooking and cleaning. PSR ¶ 36. The house itself does not even belong to his parents—it was lent to them by the *patron* who also owns the land that his family works. *Id.* ¶ 35.

Mr. Escoto maintains good relationships with his family. Although his mother and stepfather separated approximately three years ago, he speaks to his stepfather weekly (Mr. Arjelio purchased a cell phone to maintain contact with Mr. Escoto). His stepfather is in good health and still working as a *campesino*. Mr. Escoto's sisters live with Mr. Arjelio; his oldest sister is working in a factory, and his youngest sister recently had to leave school because his father could not afford it. He also maintains periodic contact with his mother by telephone.

Mr. Escoto attended school through the second grade. He attended the same small school as his siblings, approximately a 20-minute walk from their home. The school had roughly 30 students and three teachers and covered first through third grade. As he explained to U.S. Probation, he had to leave school at age approximately seven years of age in order to work with his father in the fields. This reality saddened him because most children, including his sisters at the time, continued school through at least the sixth grade. The schooling was free, and the

---

[2] Mr. Escoto does not know his biological father.

DEFENDANT'S SENTENCING MEMORANDUM
*ESCOTO-ESCOTO*, CR 22–00133 VC

3

family only had to pay for school supplies like a school bag and notebooks, but Mr. Escoto's stepfather could not earn enough to pay for food for the entire family.

Starting at the age of seven, Mr. Escoto would join his father each morning in rising at 4:30 a.m. in order to begin working in the fields at 5 a.m. until approximately noon. Mr. Escoto and his stepfather were the primary breadwinners for the family, but his mother also earned money occasionally by washing clothes; she also, of course, was primarily responsible for supervising the children. When his sisters were too young for school, they tagged along with Ms. Asucena doing laundry.

As noted, the land did not belong to Mr. Escoto's family and they earned just about $6 per day for their labor. The land belonged instead to a boss who owned the land and their house. He was rich and lived in the capital, Tegucigalpa. The *patron* had about a dozen or so *campesinos* working for him, and Mr. Escoto met him just once approximately fifteen years ago, when he came to pay the workers. There was (and is) little to no economic opportunity in the countryside of Honduras for Mr. Escoto. The family would sometimes go hungry. PSR ¶ 36. In addition, Mr. Escoto was fearful that he would be forcibly conscripted into the criminal gangs that are powerful in Honduras if he remained there. *Id.* ¶ 37. Mr. Escoto also reported to U.S. Probation that his cousin was murdered by a gang member for unknown reasons. *Id.*

As the Court is likely aware, Honduras is a dangerous and violent country with one of the highest murder rates in the world.[3] Although there are many reasons for the high crime and murder rates, political instability and gang activity have contributed to the violence for decades.[4] In the 1980s, the United States used Honduras to base American soldiers as they fought against the Nicaraguan government. *Id.* Neighboring countries Guatemala and El Salvador also endured internal wars that left the countries unstable. *Id.* Because many were left unemployed and

---

[3] *See, e.g.*, Insight Crime (U.S. A.I.D.), Gangs in Honduras, *available at* https://insightcrime.org/images/PDFs/2015/HondurasGangs.pdf (last accessed Feb. 22, 2023).

[4] *See, e.g.*, 2017 Country Report of Human Rights Practices for 2017: Honduras, U.S. Dep't of State, Bureau of Democracy, Human Rights and Labor, *available at* https://www.state.gov/reports/2017-country-reports-on-human-rights-practices/honduras/ (last accessed Feb. 22, 2023).

DEFENDANT'S SENTENCING MEMORANDUM
*ESCOTO-ESCOTO*, CR 22–00133 VC

weapons were readily available, criminal groups began to form throughout Central America. *Id.* Gang violence is also responsible for the violence throughout Honduras. Since the 1990s, the United States has played a significant role in Honduran gang culture.[5] Mara Salvatrucha ("MS-13"), the 18th Street gang ("M-18"), and Barrio 18, three gangs that originated in Los Angeles, are now three of the most prevalent gangs in the country.[6] These gangs expanded into Honduras after the United States passed legislation in 1996 that led to the deportation of many undocumented immigrants with criminal records.[7] Although sources vary as to how many gang members are currently active, estimates range between 5,000 to 36,000 members. *Id*. at 7. As a result, life in Honduras is tenuous; poverty and violence are primary reasons why many people like Mr. Escoto must fled the country to find a life where they can be safe and find economic opportunity.

Mr. Escoto decided at age 16 to immigrate to the United States with the hope of earning a better living and supporting his family back home. PSR ¶ 36. Mr. Escoto came unaccompanied, although his brother also immigrated to the southeastern United States. Mr. Escoto travelled through Honduras mostly by taxi or bus for approximately 15-16 hours, then walked through most of Mexico to the border over approximately eight days, walking six to seven hours a day. He walked with other migrants he met along the way, begged for food, and stayed in temporary housing for migrants. Sometimes he went hungry because local people were not sympathetic. He crossed into Texas from Piedras Negras, Mexico. Mr. Escoto did not attempt to evade border patrol; he explains that if you are unaccompanied minor, you may turn yourself over to the authorities and obtain a placement at foster housing. *See* PSR ¶ 33. Mr. Escoto was placed at a foster facility in Texas with approximately 105 other unaccompanied minors. He attended school every day.

---

[5] *See* Gangs in Honduras at 1.
[6] See Clare Ribando Seelke, Gangs in Central America, Cong. Res. Serv., 3 (Aug. 29, 2016), *available at* https://fas.org/sgp/crs/row/RL34112.pdf (last accessed Feb. 23, 2023); *see also* Gangs in Honduras at 1.
[7] *See* Gangs in Honduras at 1.

DEFENDANT'S SENTENCING MEMORANDUM
*ESCOTO-ESCOTO*, CR 22–00133 VC

5

He was released from foster care when he turned 18 years old, and tried to find work, first in Virginia, then later in Washington state, and finally in Oakland, California. As the PSR notes, he worked in construction and at a retail bakery for more than a year before those minimum wage-opportunities ran out. He has been residing in the Bay Area for approximately two years. It was here that he made the mistake of accepting an offer to sell drugs in exchange for enough money to pay his rent ($600 monthly). The arrangement barely allowed him to send any money to his family, let alone make "a living" as the government uninformedly claims. Of course, selling drugs also was not safe for Mr. Escoto. Approximately, three months before he was arrested in San Francisco in the instant case, he was the victim of an attempted robbery and when he resisted (he never had the money to pay for the drugs he was selling), he was stabbed twice.

Mr. Escoto profoundly regrets this chapter of his life—it was a waste and harmful to those around him. At the end of the interview with U.S. Probation, when asked what he wanted for himself in the future, he responded, "I want to have a life and *be someone*," with the touching emotion of a young man with his life still before him. PSR ¶ 40.

### III. LEGAL STANDARD

The Court is familiar with the directives of *United States v. Booker,* 543 U.S. 220 (2005) and 18 U.S.C. § 3553(a). The Sentencing Guidelines range is not mandatory and the Court has a duty to exercise judgment and discretion in arriving at an appropriate sentence. Importantly, the Court may not presume the Guidelines range is reasonable. *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam). Instead, the Court must consider the Guidelines range, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(1), (a)(4) and (a)(6). In crafting a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a), the Court must also consider the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the

defendant; and (D) to provide the defendant with needed educational and vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

IV. **ARGUMENT**

Several matters warrant the Court's consideration in connection with Mr. Escoto's request for a sentence of 24 months:

*First*, the charged offense and Mr. Escoto's current circumstances counsel in favor of a sentence of 24 months. His criminal conduct, while certainly serious, was primarily the result of his youth, his poverty, the absence of familial supervision, and ultimately because he did not believe he had viable alternatives. Of course, Mr. Escoto has no prior convictions and has never served time in custody before, so 24 months is a harsh sanction for such a young person (literally, a tenth of his life). The government understandably emphasizes the particular dangers of fentanyl to users, but of course, Mr. Escoto was not in a realistic position to tell a drug trafficking organization to sell marijuana, for example, instead. Mr. Escoto was and is, from the perspective of the drug trafficking organizations that employed him, completely expendable. He was not a leader or organizer in the operation, or even a manager.[8] He was a street-level dealer, and a refugee from extreme poverty in Honduras who sought economic opportunities in the United States and was taken advantage of by a larger drug trafficking organization. Notably, the federal government prosecutes far more street-level dealers of fentanyl, than higher level offenders.[9] And, courts have generally handed out longer sentences in cases involving fentanyl than cases involving any other major drug type.[10] Here, given the circumstances of the offense, additional

---

[8] The government's flat assertion that, "[t]he defendant deals fentanyl for a living," ECF No. 29 at 2

[9] *See* U.S. Sentencing Comm'n, Fentanyl and Fentanyl Analogues: Federal Trends and Trafficking Patterns (January 2021), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210125_Fentanyl-Report.pdf (last accessed Feb. 22, 2023) at 28 (in 2019, 39.6% of federal prosecutions are of street-level dealers, whereas only 3.5% of those prosecuted are managers, 5.6% are importers/high-level suppliers and 3.5% are leader/organizers at the top).

[10] *Id.* at 39.

DEFENDANT'S SENTENCING MEMORANDUM
*ESCOTO-ESCOTO*, CR 22–00133 VC

custodial time is certainly not necessary to mete out sufficient punishment, consistent with the mandate of § 3553(a).

*Second*, deterrence does not justify a longer sentence. As an initial matter, the available data does not support the conclusion that longer sentences promote general deterrence.[11] Given the particular the circumstances of this case, the concept of specific deterrence does not make much sense either. Mr. Escoto, like many immigrants, faces far worse conditions in Honduras. The hardships at home drove him to take the extraordinary and unwelcome steps of fleeing his family and his country, and ultimately to commit the instant crime. Mr. Escoto took these steps in order to survive. The ordeal of his incarceration and near-certain deportation thereafter is more than sufficient to deter him from reoffending or returning to this country.

*Third*, public safety certainly does not mandate a longer sentence. Mr. Escoto has been removed from the community and will eventually be removed to Honduras. He has no history of violence, and again, he was not a leader or organizer, and he is not a member of any street gang. Quite to the contrary, he was the lowest man in the operation and the least culpable person involved in the entire operation. Although in this case, as in so many before, the government has again attempted to justify federal prosecutions of street-level dealers in the Tenderloin by citing statistics concerning substance abuse and deaths in the area, those very statistics demonstrate that prosecuting the lowest level offenders has had minimal impact on public health and safety. Indeed, nearing on three years after the U.S. Attorney's Office launched its misguided "Federal Initiative for the Tenderloin," it is now clear that the rush to maximally punish street level dealers has been largely ineffective in stemming overdoes in San Francisco.

*Fourth*, Mr. Escoto personal history strongly counsels in favor of a downward variance. Although this Court sees many defendants from disadvantaged backgrounds, Mr. Escoto has faced truly extreme challenges during his life. Despite his own poverty and lack of education, he

---

[11] *See, e.g.,* Kelli D. Tomlinson, *An Examination of Deterrence Theory: Where Do We Stand?* FEDERAL PROBATION 80 (3), 33-38 (Dec. 2016) ("Severity of punishment was once thought to deliver the main deterrent effect; the more severe the consequence for law-breaking, the less likely an individual is to commit a crime. However, this assumption has not been supported in the literature.").

has tried to support his family. Thus, while the instant offense is reprehensible, it is also understandable why Mr. Escoto committed the crime out of desperation. Mr. Escoto's personal circumstances do not favor imposition of a longer sentence.

*Fifth,* and finally, Mr. Escoto's request comes at the tail end of the COVID-19 pandemic. Over the past nine months, conditions in the jail have still been worse than usual with periodic quarantines. Even after serving his federal sentence, Mr. Escoto is likely to spend more time in immigration custody under equally harsh conditions. In sum, this is an exceptionally difficult to time to serve a sentence. Time served now is much harder than time served under normal circumstances and conditions are not likely to change anytime soon. Thus, a 24-month sentence imposed now should be considered a much harsher sanction than it would normally be.

### V.    CONCLUSION

Mr. Escoto respectfully recommends a sentence of 24 months, followed by three years of supervised release.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated:    February 22, 2023 | JODI LINKER<br>Federal Public Defender<br>Northern District of California |
|  | /S<br>DAVID W. RIZK<br>Assistant Federal Public Defender |